IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARRY RICHARD DENT,

        Petitioner,

    v.

STEVE FRANKE, as Superintendent,
Two Rivers Correctional Institution,

        Respondent.

Civil No. 2:12-cv-00389-BR

OPINION AND ORDER

C. RENEE MANES
Assistant Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR 97204

        Attorney for Petitioner

ELLEN F. ROSENBLUM
Attorney General
NICK K. KALLSTROM
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301

        Attorneys for Respondent

1 - OPINION AND ORDER -

BROWN, Senior Judge.

Petitioner, an inmate at the Two Rivers Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Court DENIES the First Amended Petition for Writ of Habeas Corpus (ECF No. 33).

## BACKGROUND

I. **Summary of Facts**

In December 2000, Petitioner purchased a home and property in Columbia County on contract from the McGilvra Family Trust. The property was located about 200 yards from the residence of Laurene McGilvra, a 73-year-old woman who was the sole surviving trustee.[1] By April 2002, Petitioner became frustrated with the condition of his home and the property, and with a pre-existing water rights agreement that ran with the property. Petitioner expressed his frustration to Mrs. McGilvra and to her son, Tom McGilvra, who lived nearby and whose own property benefitted from the water rights agreement. Petitioner stopped making payments on the contract, and on May 19, 2002, Petitioner taped a note to Mrs. McGilvra's door stating that the property was "incorrectly contaminated in more ways than one," that he would not clean up "any poisons or debris on the property," that the property sale documents were "a mess which was designed to excessively control

---

[1]The McGilvra Family Trust was created by Mrs. McGilvra and her husband, who was deceased by the time Petitioner purchased the property.

and/or destroy" him, and that the people named in the agreement were "people who are gone and/or DEAD." Resp. Exh. 118, Exh. A at p. 89. The note frightened Mrs. McGilvra, who consulted her children, her friends, and her attorney for advice.

On May 21, 2002, Mrs. McGilvra was preparing to leave the next day for a trip out of the state. Her son, Tom McGilvra, spoke with her that night. When the friend who was going to give Mrs. McGilvra a ride to the airport arrived at Mrs. McGilvra's house on the morning of May 22, 2004, the front door was broken and Mrs. McGilvra was not home. Tom McGilvra went to the home later that day and found the front door had been kicked in and a pool of blood in the front yard, which prompted him to call the police. The responding officers discovered "significant bloodshed evidence within the house" suggesting "that some person, after having been wounded, had been taken from the master bedroom of the house, through the house and out of the house through the front door." The officers also found blood on the siding of the house, in the yard, and at the top of the driveway. The blood matched Mrs. McGilvra's DNA profile.

The officers were unable to locate Mrs. McGilvra and brought in two search dogs to track her scent. Both search dogs tracked the scent to the edge of Petitioner's property. When asked, Petitioner refused permission for the second tracking dog to continue onto his property.

On May 24, 2002, police officers obtained a warrant to search Petitioner's residence. They found a knife between a mattress and box spring. Petitioner stated that he owned the knife. An Oregon State Police forensic scientist examined the knife and found blood on the hilt. When later tested, the blood on the knife also matched Mrs. McGilvra's DNA profile.

On the morning of May 25, 2002, Petitioner's house and a shed burned down. Officers arrested Petitioner on suspicion of arson, and during questioning he admitted to starting a fire in his house. When asked about Mrs. McGilvra, Petitioner stated he did not care that she was missing. When asked whether he did something with her body, he responded, "I wouldn't say." On July 15, 2003, Petitioner pleaded guilty in Columbia County Circuit Court to one count of Arson, and was sentenced to 60 months of probation. On February 4, 2004, a citizen found human remains near a logging road in Columbia County. Forensic scientists identified the remains as those of Mrs. McGilvra.

## II. Summary of Proceedings

On February 13, 2004, a Columbia County grand jury indicted Petitioner on five counts of Aggravated Murder, one count of Murder, one count of Kidnaping in the First Degree, one count of Kidnaping in the Second Degree, and two counts of Burglary in the First Degree. Resp. Exh. 104-A. The trial judge appointed two attorneys, Joseph Watson and Daniel Woram, to represent Petitioner.

In November 2004, Watson raised concerns with the trial court as to Petitioner's capacity to assist counsel in his defense. On November 30, 2004, the trial court conducted a hearing. At the hearing, Petitioner's attorneys presented the testimony and written report of Norvin R. Cooley, Ph.D. Dr. Cooley opined that Petitioner did not meet Oregon statutory criteria establishing his competency to stand trial.[2] Following the hearing, the trial judge ordered Petitioner to be evaluated at the Oregon State Hospital ("OSH") as to his capacity to proceed. Petitioner was admitted to OSH on December 7, 2004, where he remained until his discharge in March 2005. Prior to Petitioner's discharge, Ronald A. Glaus, Ph.D., Senior Clinical Psychologist, prepared an evaluation regarding Petitioner's ability to aid in his defense.

In his evaluation, Dr. Glaus noted this was Petitioner's second admission to OSH.[3] Pet. Exh. A, p. 159. Dr. Glaus interviewed Petition for over an hour, and referred to the charging documents, OSH chart notes and reports, and the November 9, 2004, evaluation signed by Dr. Cooley. *Id.* Dr. Glaus reported that,

---

[2]Under Or. Rev. Stat. § 161.360(2), "A defendant may be found incapacitated if, as a result of a qualifying mental disorder, the defendant is unable: (a) To understand the nature of the proceedings against the defendant; or (b) To assist and cooperate with the counsel of the defendant; or (c) To participate in the defense of the defendant."

[3]Petitioner's first admission was in August 2002, when he was evaluated for his ability to aid and assist in the defense against the Arson charges.

when asked, Petitioner understood that the purpose of the interview was to evaluate Petitioner to determine if he was ready to aid and assist his lawyers. *Id.*

Dr. Glaus noted that as of the evaluation date, Petitioner continued to receive prescription Risperidone, and had "shown stabilization in his mental condition and currently presents with no signs or symptoms of a mental illness." Pet. Exh. A, p. 164. After relating Petitioner's medical and mental health history, and the results of cognitive testing, Dr. Glaus provided the following "Mental Health Summary/Conclusions:"

> [Petitioner] presented upon examination as focused, goal-directed, and cognitively clear. He did not demonstrate any signs or symptoms of a formal thought disorder. His affect was calm and his mood appropriate to the circumstance. His intellectual level appeared to be at least average, if not slightly above average. His behavior was purposeful and within normal limits.

Pet. Exh. A, p. 166.

Dr. Glaus gave Petitioner an Axis I diagnosis of "Schizophrenia, paranoid type (by history only)," and an Axis II diagnosis of "History of diagnosis of a personality disorder, not otherwise specified." *Id.* Regarding Petitioner's ability to assist in his defense, Dr. Glaus stated that Petitioner "showed a good understanding of the proceedings against him," "appear[ed] quite able to assist and cooperate with his legal counsel," and "demonstrated a sound ability to participate in his defense." Pet. Exh. A, p. 167. Dr. Glaus concluded that Petitioner's "mental

disease of schizophrenia, paranoid type, by history only, does not presently incapacitate his basic understanding of the legal proceedings against him, the ability to cooperate with counsel, or the ability to participate in his defense. He presents as having the capacity to stand trial and to maintain the psychological resiliency to endure the distress of a trial." *Id.* Dr. Glaus recommended that Petitioner "[f]ollow the directions of medical authority in the use of psychotropic drugs." Pet. Exh. A, p. 168.

Following Petitioner's discharge from OSH on March 7, 2005, the trial judge scheduled an aid-and-assist hearing for May 2005. On May 4, 2005, however, Attorney Watson moved to withdraw, citing a breakdown in the attorney-client relationship. The trial judge granted the motion, but cautioned Petitioner, "I don't want you to think that lack of cooperation with future counsel will result in a similar response from the court." Tr. 101. Petitioner agreed to Attorney Woram's continuation as co-counsel, and the trial judge appointed Charles Fryer as lead counsel. On May 19, 2005, Petitioner formally accepted Fryer as his lead attorney. Fryer then reported to the court that "he was authorized by [Petitioner] to say that he does not wish to take advantage of his right to request a hearing on the [aid and assist] issue and wishes the court to make the decision based upon the information the court has." Tr. 109. It is not clear from the record before this Court

what information, other than Dr. Glaus's report, the trial judge had before him.

Over the next several months, several pretrial motions were litigated, a number of which were argued at an omnibus hearing on November 30, 2005. On March 27, 2006, the trial judge ruled on several of the motions by letter opinion.

In April 2006, Petitioner filed a *pro se* motion for the appointment of a new attorney or to represent himself, and Fryer filed a motion regarding Petitioner's fitness to proceed. In support of his motion, Fryer offered an extensive affidavit detailing Petitioner' mental health treatment and diagnosis history, information from Columbia County Jail personnel, and reports of investigators' together with counsels' interactions with Petitioner. Fryer concluded that Petitioner was not able to aid and assist. Resp. Exh. 123. Fryer also noted Petitioner's adamant denial that he suffered from any mental illness and strenuous objection to the motion. *Id.* On April 6, 2006, the trial judge issued an order finding reason to doubt Petitioner's fitness to proceed by reason of insanity and ordering Petitioner to OSH for a competency evaluation. Resp. Exh. 123. On April 13, 2006, Petitioner was re-admitted to OSH.

On June 22, 2006, consulting psychiatrist Gary Field, Ph.D., conducted an evaluation of Petitioner's ability to stand trial and prepared a written report. Pet. Exh. A, pp. 66-72. In conducting

his evaluation, Dr. Field relied upon an hour-plus clinical interview with Petitioner, as well as OSH records and reports from Petitioner's current hospitalization. Pet. Exh. A, p. 66.

Dr. Field noted that when Petitioner arrived he was not taking psychotropic medications, and had not been doing so since May 2005. Pet. Exh. A, p. 67. Upon Petitioner's arrival, an Interdisciplinary Treatment Note indicated he "presented with no signs of mental illness," that he was not a behavior problem on the ward, and that he "presented highly suspicious to paranoid thinking, but not at the level of a delusional disorder." *Id*. Other treatment notes indicated that Petitioner "perseverated on his legal case," but that his "thinking was clear except for his perseveration and negativity regarding his legal case;" that he "presented as defensive and grandiose" and "became upset when others challenged his logic;" that he was "agitated and angry about his lawyer" and was "often irritable." Pet. Exh. A, p. 68. It was also noted, however, that Petitioner's "thoughts were organized and goal-directed," that he was "knowledgeable about the legal system," his "thinking was clear and well-organized," he "participated in ward treatment groups and classes," and that "[n]o evidence of psychosis was present." *Id*. Dr. Field summarized the treatment notes as follows:

> In summary, the clinical record documents no reports of observable evidence of psychosis during this hospital admission. In a May 24, 2006, Treatment Note, the ward psychiatrist reports a review of [Petitioner's] treatment

> records and concludes that insufficient evidence was
> found to justify a diagnosis of schizophrenia, paranoid
> type. Given the absence of significant signs of
> psychosis, the ward psychiatrist concludes [Petitioner]
> likely suffers from an Axis II personality disorder only.

*Id.*

In his Mental Summary and Conclusions, Dr. Field noted that while Petitioner was previously diagnosed with schizophrenia, paranoid type, Petitioner's current treating psychiatrist, Dr. Chen, "raises questions regarding the existence of any Axis I mental disorder." Pet. Exh. A, p. 70. Dr. Field's review concluded that while Petitioner has "a personality disorder involving paranoid, narcissistic, and antisocial features; the personality disorder alone may explain his presentation," and that Petitioner "has been off psychotropic medications for more than a year without presentation of psychotic symptoms." *Id.* Dr. Field further noted that while Petitioner has shown "consistent suspiciousness of others, a demandingness that his needs be met immediately, denigration of others by attitude and statements, and defensiveness if challenged," he has not "presented evidence of psychosis" during the course of his hospitalization." *Id.*

Dr. Field stated that Petitioner's diagnostic picture "is unclear." Pet. Exh. A, p. 71. While Petitioner "has some history that would suggest schizophrenia . . . his presentation over the past several months (or years) argues against that diagnosis." *Id.* Dr. Field explained the existence of two prominent hypotheses:

The first is that [Petitioner] has an Axis I mental illness (along with his personality disorder) that is in current remission. The second hypothesis is that [Petitioner's] personality disorder stands alone, and that he may become psychotic in certain prolonged stressful situations. The prevailing evidence (i.e. – recent functioning without psychotropic medications) currently favors this second possibility. Certainly [Petitioner's] personality characteristics of paranoia and narcissism dominate his clinical picture. It is likely with stress his paranoia and narcissism rise to a level of meeting criteria for delusional disorder, persecutory type.

*Id.* Ultimately, Dr. Field rendered the following diagnosis:

Axis I    Delusional disorder, persecutory type, in remission
          Rule out schizophrenia, paranoid type, in remission

Axis II   Paranoid personality disorder with narcissistic and antisocial features.

*Id.*

Regarding Petitioner's ability to assist in his defense, Dr. Field stated that Petitioner "appears currently capable of understanding the proceedings against him," "appears currently capable of assisting and cooperating with a legal counsel as a technical advisor," and "appears currently capable of participating in his defense." Pet. Exh. A, pp. 71-72. Dr. Field concluded:

[Petitioner's] mental disease of delusional disorder, persecutory type, in remission, does not presently incapacitate his basic understanding of the legal proceedings against him, the ability to cooperate with counsel, or the ability to participate in his defense. He presents as having the capacity to stand trial and to maintain the psychological resiliency to endure the distress of a trial.

*Id.* Petitioner was release from OSH on June 28, 2006.

On July 3, 2006, the trial court held a competency hearing. Although the trial judge had before him Dr. Field's report, neither the prosecutor nor Petitioner's counsel offered any other evidence. The trial court concluded that, "Given the report of Dr. Field I believe this court has no option but to find that [Petitioner] is able to aid and assist in his defense in this matter and will so find." Tr. 197.

Having found Petitioner able to aid and assist in his defense, the trial court turned to the matter of Petitioner's motion for removal of counsel. In an extensive colloquy with Petitioner (spanning over twenty pages of transcript), the trial judge discussed Petitioner's dissatisfaction with his attorneys and his intent to represent himself. In particular, Petitioner explained that he was unhappy about the delay in bringing the case to trial and about the challenges to his mental health. He was also unhappy that his attorneys had not followed through in investigating witnesses and issues he deemed important to his defense. Tr. 201-17. Petitioner told the court: "It's my right to represent and defend myself and that is what I must do. I am competent, my case is winnable." Tr. 217. Petitioner also noted that he had successfully worked with attorneys in the past and acknowledged that he may need a "legal advisor" to help him "with the protocol in the court." Tr. 219.

After hearing Petitioner's concerns, the trial judge cautioned

Petitioner against representing himself:

> You've indicated that you wish to represent yourself,
> which seems to me to be a huge mistake. Obviously there
> is no more difficult technical type of legal proceeding
> that is held in the state Circuit Court than a capital
> Murder case, and as you've identified, understandably you
> have no legal training and even if you did have legal
> training it would seem to me that as the defendant you
> may not have the objectivity to do an appropriate defense
> of the case.
>
> And so I guess I cannot state anymore strongly—it seems
> to me to be an absolute mistake if not a disaster for you
> to attempt to defend yourself. But you are also
> competent, as has been determined by the state hospital
> and this court, to make decisions good and bad and so if
> you wish to be represented in this matter, which I would
> recommend, then you will have to work with Mr. Fryer and
> Mr. Woram.
>
> And in the event that you decide to represent yourself I
> would not be appointing different counsel for purposes of
> giving you advice. You would still be required to rely
> on Mr. Fryer and Mr. Woram for your legal assistance in
> the event that you were to decide to try the case.

Tr. 230. Following this warning, Petitioner explained that he

would not work with Fryer or Woram, stating: "I do assert my

rights to defend myself. I realize—I know all the things you're

saying." Tr. 231. He further explained, "I do understand the

heavy responsibility put on me." Tr. 232.

The trial court presented Petitioner with a waiver-of-attorney

form. Resp. Exh. 125. The form explained in some detail the

benefits Petitioner would forego by representing himself, and

required Petitioner to acknowledge each of those benefits would be

lost. *Id.* On the form, Petitioner indicated that he had "16+"

years of education; that he had been represented by an attorney in a criminal proceeding in the past; that he understood his rights; and that he understood the disadvantages to self-representation. *Id.* Petitioner inquired of the judge whether he could amend the form by interlineation to specify that any appointed legal advisor would be appointed "only for protocol." Tr. 233; Resp. Exh. 125, p. 1. The court then engaged in further colloquy with Petitioner to confirm that Petitioner would be permitted to conduct jury selection, receive discovery, and receive his attorneys' "work product." Tr. 236-38, 256. The trial judge ultimately accepted Petitioner's Waiver of Attorney form:

> I'm going to allow you to waive your right to counsel. I am going to continue Mr. Fryer and Mr. Woram as counsel to provide you with advice in this case and I'm going to instruct them to be present throughout the course of the trial to provide you that assistance.
>
> It's up to you to choose whether you utilize them or not. I would urge that you do so.

Tr. 241.

Four days later, at a further hearing on July 7, 2006, the trial judge re-visited the matter of self-representation:

> [B]efore we continue today I just wanted to make sure that it is still your intention to represent yourself in this matter. You've had a few days to give some thought to it. Obviously you've received a fair amount of materials. I don't know whether or not you've had any change of heart, realizing the grave responsibility that you are taking on.
>
> And I don't believe that I have any additional words that I can offer that would express my concern about the decision that you've made to represent yourself and the

seriousness of this matter and the general, almost I would say universal belief that representing one's self is an absolute mistake, and that -- and feel the need just to once again reiterate that before we proceed further and insure that it is still your desire to represent yourself given the court's indication that it would not disqualify or remove your attorneys from this case that have been appointed.

So ..., is it still your intention to represent yourself?

Tr. 259-60. Petitioner confirmed that he still intended to represent himself, explaining, "I give it serious consideration quite often[.]" Tr. 260. The court again accepted Petitioner's waiver, and explained that the appointment of Fryer and Woram would continue such that "[t]hey are available to you at anytime in this case." Tr. 260-61.

Jury selection took place from July 18, 2006, through July 26, 2006. Petitioner questioned prospective jurors, including as to the degree of knowledge they had about the case, their knowledge of and/or relationship to persons involved the case, and whether they would give additional weight to the testimony of police officers. Petitioner argued bases to exclude several jurors, and exercised his peremptory challenges.

On August 1, 2006, the guilt phase of Petitioner's trial began. Petitioner gave a brief opening statement. Tr. 359-60. Throughout the trial, he cross-examined the prosecution's witnesses, and was often able to bring out prior inconsistent statements made by witnesses, often at particular pages of the discovery. See, e.g., Tr. 598-601; 1075. Petitioner elicited

testimony that he was a person with no prior history of violence. *See, e.g.*, Tr. 743-44; 788; 836-37; 910; 1035. Petitioner elicited testimony portraying the note left on Mrs. McGilvra's door as containing no overt threats other than dissatisfaction over a property sale. *See, e.g.*, Tr. 540, 678, 3199-20. Petitioner pointed out other potential suspects, such as previous renters Ms. McGilvra had evicted from the property, or Mrs. McGilvra's son, Tom, who owed money to the trust. Tr. 486, 629. With the assistance of his attorneys and their investigator, Petitioner issued several subpoenas and called several witnesses in his defense.

On September 7, 2006, the parties rested in the guilt phase. Prior to closing argument, the trial court directed the parties to return all of the written jury questionnaires they had received before voir dire. Petitioner gave a lengthy closing argument, at the conclusion of which he pulled out a jury questionnaire for one of the alternate jurors, and stated, "I will say there's been one juror who has been openly chummy . . . with the prosecutor and basically as far as I'm concerned he's . . . with the prosecutor, not me or unbiased jury." Tr. 4545. Outside the presence of the jury, the Court admonished Petitioner:

> Okay. Before we bring the jury in I want to address a matter that occurred at the end of the day yesterday and that occurred, Mr. Dent, in our closing argument. . . .
> When you, in my opinion, issued a veiled -- thinly veiled threat to . . . an alternate juror . . . .

> This court had specifically instructed you . . . that you
> were to return to me all of the jury questionnaires.  I
> advised you after looking at them that one was missing
> and told you that it needed to be provided to me as soon
> as you could find it. . . .  My observation was that you
> intentionally violated that court order and that you had
> predetermined that you were going to use that
> inappropriately to threaten an alternate juror in this
> case.  For that act I am going to find you in summary .
> . . contempt of court.

Tr. 4548-49.[4]

After the jury returned a unanimous verdict of guilty on all counts and had been excused until commencement of the penalty phase, the trial judge re-appointed Fryer and Woram to represent Petitioner.  The judge explained his reasoning for re-appointment first as the very technical, legal oriented nature of a penalty phase proceeding and, second, due to Petitioner's failure to follow the court's direction and his act in directly defying an order of the court.  Tr. 4657-58.

The trial judge initially set the penalty phase of Petitioner's trial to start in early October.  At a September 22, 2006, hearing, the judge reiterated his reasons for revoking Petitioner's self-representation, *i.e.*, the technical nature of the penalty phase and Petitioner's direct defiance of the court's order.  Tr. 4677.  Petitioner's attorney argued to the Court that Petitioner had an "absolute 6th Amendment right to represent himself and cannot be forced to accept counsel" under *Faretta v.*

---

[4]Petitioner attempted to interrupt the trial judge throughout this statement.

17 - OPINION AND ORDER -

*California*, 422 U.S. 806 (1975). Counsel also argued that "if a defendant's competent to stand trial then he is competent to decide to represent himself and to do so" under *Godinez v. Moran*, 509 U.S. 389 (1993). Tr. 4683. Following another lengthy colloquy, the trial judge denied a request to appoint new counsel to represent Petitioner at the penalty phase and refused to allow Petitioner to continue representing himself. Although the trial court concluded that it had "no reason at this point in time to believe that [Petitioner] is legally incompetent," he nevertheless found Petitioner forfeited his right to represent himself because of his failure to follow court orders. Tr. 4688-92. Petitioner's attorney then filed a motion for further hearing on Petitioner's competency to proceed. Tr. 4699.

On October 10, 2006, the trial court conducted an aid-and-assist hearing. Petitioner's counsel called Dr. Norvin Cooley to testify as to Petitioner's competency to proceed. Petitioner became repeatedly disruptive during Dr. Cooley's testimony, and, eventually, the trial judge removed Petitioner from the courtroom to observe the proceedings via a closed-circuit television. Tr. 4740-43. Based upon his prior examinations of Petitioner, his review of Petitioner's prior mental health history, his review of transcripts of the testimony and arguments during the guilt phase, and his observation of Petitioner in court that morning, Dr. Cooley

testified that Petitioner did not qualify under Oregon law as a defendant who is competent to proceed.  Tr. 4756.

At the conclusion of the hearing, the trial judge stated as follows:

> I would note that during the course of the trial that [Petitioner] was difficult to deal with, that the court had to admonish him on numerous occasions for his behaviors.  That he continued to object consistently and strongly to any suggestion that his mental health was in anyway compromised.
>
> But [Petitioner] was ultimately able to conform his behavior, at least up until the point in time in the closing argument where the court found him in contempt. It's my position that at that time it was a conscious choice of his, obviously, by my finding of contempt, that he made the decision not to return to the court the juror questionnaire that he held out and commented on in his closing arguments.
>
> [Petitioner] appeared today in court differently, I would find, than he has during the trial.  That there was much more of a twitching, a nervousness about him, an inability for him to sit still.  That despite repeated cautions from the court he continued to speak when instructed not to do so.

Tr. 4796-97.  The trial judge went on to note Petitioner's removal from the courtroom and his subsequent actions, and concluded:

> It appears to me that as of today [Petitioner] is unable to conform his behavior in spite of the court's admonishment and I'm concerned enough about his current mental health that I do not believe that we can proceed and so I'm going to order that [Petitioner] be returned to the state hospital for further evaluation and determination as to his ability to proceed further.

Tr. 4798-99.

On October 17, 2006, Petitioner was once again admitted to the Oregon State Hospital.  On November 7, 2006, Meroujan Maljian,

M.D., Forensic Psychiatric Fellow, conducted a two hour and fifteen minute interview with Petitioner. Scott Reichlin, M.D., Director of Forensic Evaluation Services, and Rochelle Frehling, Psy.D., were also present. On November 16, 2006, Drs. Maljian and Reichlin prepared an Evaluation Report on Petitioner. Resp. Exh. 139.

As to Petitioner's past psychiatric history, the Report noted that while Petitioner had been diagnosed with schizophrenia back in 2002, this diagnosis "has since come under question since [Petitioner] has not shown any overt psychotic symptoms for years and has not been taking any psychiatric medications for over one year now." Pet. Exh. A, p. 14. As to Petitioner's mental status, the Report observed that:

> He was cooperative with the evaluation process, displaying a sarcastic attitude. He was verbose and answered most questions with extra information and opinionated commentaries. Otherwise, his speech was not pressured and had normal volume, rate, rhythm, and character. His thought process was somewhat tangential in that he tended to go off topic if allowed to speak at length. He perseverated on themes of how he is being set up by the police and the incompetence of all his previous attorneys. His thought content was highly cynical, sarcastic, and suspicious when it came to his legal situation. He had numerous ideas of how the Columbia County legal system is entirely corrupt, from the police to the judges to the lawyers, and how they are all trying to set him up.

Pet. Exh. A, p. 16. The Report noted a "mild paranoid flavor to some of [Petitioner's] thoughts regarding the police and his lawyers," but concluded that "if it is indeed a misrepresentation of reality, such seems more consistent with a paranoid

personality." Pet. Exh. A, p. 16. Moreover, the report noted that, because Petitioner had been found guilty of Aggravated Murder, he had "rational reasons to be hostile towards the legal system, and this makes it harder to determine if his negative comments represent delusions." Pet. Exh. A, p. 18.

Drs. Maljian and Reichlin gave Petitioner an Axis I diagnosis of "Delusional disorder, persecutory type, provisional," and an Axis II diagnosis of "Personality disorder, not otherwise specified." Pet. Exh. A, p. 17. Petitioner demonstrated an extensive understanding of the nature of the proceedings against him, including the potential sentences he faced, the definition of guilty except for insanity and the consequences of such a verdict, and the basic nature of criminal proceedings. Regarding his outburst at the October 10, 2006, hearing, Petitioner indicated he understood that his loss of control was not productive, and that he understood "intellectually" that his behavior was likely responsible for him being found unable to aid and assist. Pet. Exh. A, p. 19. He stated that he understood that if he misbehaved in court in the future that he could be ejected from the court. Pet. Exh. A, p. 19.

As to Petitioner's ability to aid and assist, the Evaluation Report concluded as follows:

> It is my opinion that [Petitioner's] mental disease and mental defect related to delusional disorder, persecutory type, provision, does not affect his capacity to stand trial at this time. [Petitioner] has demonstrated a

basic understanding of the legal proceedings against him, and he has shown an ability to work with counsel, and has demonstrated an ability to participate in his own defense. It is noted that [Petitioner] has not been cooperative with his attorneys to date, but this does not mean he does not have the ability to work with counsel. [Petitioner] demonstrated that he understands proper courtroom behavior and the need to come to an agreement with his attorney. His mental disease is not severe enough to render him incapable of cooperating with his counsel. It will be up to Petitioner if he chooses to cooperate with counsel for his defense. Petitioner's current presentation is consistent with a capacity to stand trial.

Pet. Exh. A, pp. 19-20.

Petitioner was released from OSH, and on January 23, 2007, the trial judge conducted another hearing. Counsel called Petitioner to the stand, but Petitioner refused to answer questions and ultimately became so disruptive that the judge had him removed from the courtroom to observe the proceeding via closed circuit television. Tr. 4851-54. Counsel submitted extensive written evidence of Petitioner's mental state, and called as witnesses a jail guard and Dr. Cooley. The guard testified that Petitioner's behavior over the past month was not consistent with his behavior during trial, and that he had deteriorated mentally. Tr. 4887-93. Dr. Cooley presented extensive testimony, and again concluded that Petitioner was not able to aid and assist in his defense. Tr. 4913.

At the conclusion of the hearing, the trial judge found Petitioner competent to proceed. The judge first reviewed at some length the conclusions of Dr. Field's report which was prepared

just prior to commencement of the guilty phase of Petitioner's trial, noting that the doctor recognized that while Petitioner's condition could worsen with the stress of trial, Dr. Field concluded Petitioner had the "capacity to stand trial and to maintain the psychological resiliency to endure the distress of trial." Tr. 4930. The judge then turned to his own observations of Petitioner over the course of the trial:

> The court had an opportunity to observe [Petitioner] on a daily basis during the course of trial and while his strategies were certainly questionable he did seem to have a consistent approach in attempting to raise those ongoing themes of corruption and conspiracy and consistently maintained his innocence throughout the proceeding.

Tr. 4931. The trial judge noted that as trial went on and as Petitioner grew frustrated in his ability to present evidence that he "became more combative with the court and more cynical in his manner of dealing with the court, witnesses, and others associated with the trial." Tr. 4931. Moreover, although Petitioner seemed to regularly call witnesses whose testimony was likely to his detriment, the judge noted that "once again there seemed to be a consistent and thought out approach to this line of examination of witnesses." Tr. 4931. On the issue of Petitioner's retention of the jury questionnaire, the judge found that Petitioner's conduct indicated "a deliberate deceptiveness on [Petitioner's] behalf" and "the court would also attribute a calculated approach and process in other dealings with the court when [Petitioner] would frequently

ignore or openly flout the direct instruction of the court." Tr. 4932.

Finally, the trial court reviewed Drs. Maljian and Reichlin's November 16, 2006, report at some length, as well as Petitioner's bizarre statements before the Court before he was removed from the hearing. The trial judge concluded Petitioner was competent to aid and assist in his defense, but denied Petitioner's continued request to represent himself at the penalty phase of the trial. The judge explained his conclusion as follows:

> The two seeming conclusions that the court can reach is that the bizarre statements [Petitioner] makes from time to time are either an indication of his being delusional or are an attempt by [Petitioner] to further interfere with and inconvenience the court as a result of his anger over the outcome of the guilt phase of the case.
>
> My determination is that the more likely explanation is that [Petitioner] is intentionally attempting to create difficulty given his dissatisfaction with the court's determination that he is not appropriate to represent himself in the penalty phase of this proceeding, given the court's observation of [Petitioner] in the guilt phase of the proceeding that he repeatedly refused to conform his behavior to the court's instruction, that he was deliberately dishonest with the court and in the process of being dishonest with the court used a document for the purposes of attempting to intimidate and threaten a juror, and further, that [Petitioner], in this court's opinion, does not fully appreciate the nature of a penalty phase of trial, although it did appear, while misguided, he was familiar with the process of the guilt phase of the trial.

Tr. 4936-37.

On January 24, 2007, the penalty phase of Petitioner's trial began. At the conclusion, the jury declined to impose the death

penalty. Tr. 5584. The trial judge then imposed a sentence of life imprisonment without the possibility of parole on the Aggravated Murder conviction, and consecutive sentences on the kidnaping and burglary convictions. Resp. Exh. 101.

Petitioner filed a direct appeal, asserting eight assignments of error. Resp. Exh. 105. Among his claims of error, Petitioner asserted the trial court erred by accepting Petitioner's waiver of counsel, by denying Petitioner's motion to remove a particular juror, and by failing to *sua sponte* conduct a competency hearing during the guilt phase of Petitioner's trial. Resp. Exh. 105, pp. I-iii. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *State v. Dent*, 233 Or. App. 297, 225 P.3d 152, *rev. denied*, 348 Or. 621, 237 P.3d 221 (2010).

Petitioner then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the state PCR trial court denied relief. Resp. Exhs. 111, 151). The Oregon Court of Appeals ultimately dismissed Petitioner's appeal. Resp. Exh. 154.

Petitioner then filed his petition for habeas corpus relief in this Court. The Court appointed counsel, who filed an Amended Petition for Writ of Habeas Corpus alleging nine claims for relief:

First Claim for Relief: Trial While Incompetent

Second Claim for Relief: Failure to Obtain a Knowing, Voluntary and Intelligent Waiver of the Sixth Amendment Right to the Assistance of Counsel

Third Claim for Relief: Deprivation of the Sixth Amendment Right to a Trial Before a Fair and Impartial Jury

Fourth Claim for Relief: Insufficient Evidence and Actual Innocence

Fifth Claim for Relief: Deprivation of the Sixth Amendment Right to Self-Representation at the Penalty Phase

Sixth Claim for Relief: Cruel and Unusual Punishment

Seventh Claim for Relief: Cumulative Error

Eighth Claim for Relief: Ineffective Assistance of Appellate Counsel

Ninth Claim for Relief: Deprivation of the Right to Effective Assistance of Post-Conviction Counsel

In his initial Brief in Support of Amended Petition for Writ of Habeas Corpus, Petitioner presented argument on the first three claims for relief and "preserve[d] his right to pursue the remaining claims in the petition[.]" Respondent countered that Petitioner is not entitled to relief on the merits of his first two claims as the state court's decisions are entitled to deference, and that Petitioner procedurally defaulted his third claim, which was, in any event, without merit.

After several rounds of briefing on the first three claims, Petitioner in a "Sur-Response to Sur-Reply" presented argument on the fourth claim, that Petitioner is actually innocent because if all appropriate evidence had been presented, no reasonable jury would have convicted Petitioner of Aggravated Murder but instead would have found him guilty but insane under Oregon law. Upon

being granted leave to address Petitioner's newly raised issue, Respondent argued Petitioner failed to demonstrate that he is actually innocent.

## DISCUSSION

### I. Relief on the Merits - Grounds One, Two, and Three

#### A. Legal Standards

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court

has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id*. at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Where the highest state court's adjudication on the merits of a claim is not accompanied by an explanation, the United States Supreme Court recently stated:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that

> does provide a relevant rationale. It should then
> presume that the unexplained decision adopted the same
> reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). In this case, because the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review, the Court looks to the decisions of the state trial court.

### B. Analysis

#### 1. First Claim for Relief - Trial While Incompetent

In his First Claim for Relief, Petitioner alleges he was deprived of his right to Due Process under the Fourteenth Amendment because the trial court failed to conduct a *sua sponte* hearing on incompetency when it became clear that Petitioner was decompensating during the guilt phase.

"A criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 366 (1993). The standard for competence to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam). "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez*, 509 U.S. at 402.

When the evidence before the trial court raises a *bona fide* doubt as to a defendant's competence to stand trial, the judge on his own motion must conduct a competency hearing. *Pate v. Robinson*, 383 U.S. 375, 385 (1966). "The test for such a bona fide doubt is 'whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Maxwell v. Roe*, 606 F.3d 561, 568 (2010) (quoting *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976)). "'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required,' and 'one of these factors standing alone may, in some circumstances, be sufficient.'" *Maxwell*, 606 F.3d at 568 (quoting *Drope*, 420 U.S. at 180).

"The state trial and appellate courts' findings that the evidence did not require a competency hearing under *Pate* are findings of fact to which [this Court] must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (as amended) (quoting *Torres*, 223 F.3d at 1105); *see also Thompson v. Keohane*, 516 U.S. 99, 108-10 (1995) (noting that a competency determination is a "factual issue" that "shall be presumed to be correct," and explaining that "[t]his Court has reasoned that a trial court is

better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight'").

As an initial matter, the Court notes that in arguing the trial court unreasonably concluded Petitioner was competent to stand trial, Petitioner relies not only on the record before the trial court, but on several records that were not. Petitioner has submitted several OSH records in addition to the competency evaluations that the trial judge relied upon, as well as mental health records submitted by the Oregon Department of Corrections ("DOC") which were created after Petitioner's trial had concluded.[5] As noted, however, in evaluating a trial court's competency findings, a federal habeas court must consider whether the trial court's findings were reasonable (and thus entitled to deference)

---

[5]Petitioner initially submitted the ODOC records in connection with this Court's previous rulings on issues of Petitioner's competency to represent himself and otherwise proceed in this action. Petitioner filed his initial Petition in this Court *pro se*. The Court appointed counsel to represent Petitioner pursuant 18 U.S.C. § 3006A(a)(2)(B). Petitioner subsequently moved to have counsel withdraw and to proceed *pro se*, but the Court denied his request by Opinion (ECF No. 58), based upon Petitioner's current mental condition and because the right of self-representation under *Faretta* does not extend to post-trial collateral challenges to a conviction or sentence. *See Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000) (right of self-representation does not extend to post-trial proceedings such a direct appeal); *Wiseman v. Beard*, 629 F.Supp.2d 488, 489 (E.D. Pa. 2009) (indigent inmate seeking to vacate or set aside conviction under 28 U.S.C. § 2254 does not have a constitutional right to self-representation).

*in light of the evidence presented during the course of the state-court proceedings.* 28 U.S.C. § 2254(d)(2).

Petitioner argues that to the extent that his failure to present the evidence in question to the trial court would operate as a procedural bar, any such bar should be excused under a "cause and prejudice" standard, citing *Murray v. Carrier*, 477 U.S. 478 (1986), and other cases. These cases, however, do not purport to carve out an exception to § 2254(d) that permits a federal habeas court to consider evidence not presented to the state court.[6] As such, the Court does not consider the additional OSH and DOC records that were not before the trial court.

The trial court conducted a hearing and found Petitioner competent to proceed a little over two weeks before voir dire began. The trial court relied upon Dr. Field's report prepared approximately two weeks before the hearing, which concluded Petitioner was competent to proceed. Petitioner argues the trial judge's reliance on Dr. Field's report was tainted by misconduct by state actors. Petitioner relies upon a statement made by an OSH social worker in a document entitled "Psychosocial History" which

---

[6]*Murray*, and the other cases cited, discuss "cause and prejudice" to excuse the procedural default of a claim, *i.e.*, to allow a federal habeas court to consider a claim that was not adjudicated on the merits in state court. Here, there is no default to excuse; Petitioner's competency was placed at issue at least three times over the course of the trial court proceedings, and on direct appeal Petitioner argued he was not competent at his trial under *Dusky* and that the trial court erred in not holding another competency hearing under *Pate* to make that determination.

was completed before Dr. Field performed his evaluation.[7] In it, the social worker described the anticipated manner in which Petitioner would eventually be discharged from the hospital:

> The discharge plan is for the patient to return to jail to continue with his legal process. As this is the third time this person is coming into the hospital and the second time on the Murder charges, it is hoped that the third time will be the charm in terms of the court accepting an explanation from this hospital that will be suitable with regards to the patient's mental status so that the mental status will not be a barrier to continuing with the patient's legal process.

Pet. Exh. 1, p. 76. According to Petitioner, this statement is evidence of an ulterior motive on the part of Dr. Field and other OSH doctors to find Petitioner competent on improper bases.

The Court disagrees. Even if this Court may consider the social worker's statement (which was not before the trial court), that statement amounts to no more than an opinion that the trial judge was perhaps being overly cautious given that the hospital had twice previously found Petitioner competent. Nonetheless, there is not any evidence that Dr. Field, or any other of the professionals at OSH who found Petitioner to be competent, altered a professional

---

[7]The Court notes that it does not appear this statement was ever before the trial judge, who stated at the competency hearing that he did not have OSH's "internal records," and instead "the only thing I have is the report that was prepared by Dr. Field[.]" Tr. 284. As discussed more above, if the trial judge did not have this evidence before him, it cannot properly be considered by this Court in determining the reasonableness of the trial court's finding of competency. *See* 28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398-99 (2011).

opinion as to Petitioner's competency based upon the social worker's comment.

Petitioner also argues that, even if the trial judge was entitled to rely upon Dr. Field's report to authorize trial to begin, by the time of closing argument it was undeniably apparent that Petitioner had decompensated and was no longer capable of wholly rational thought or analysis. The Court notes that prior to delivering his closing argument Petitioner conducted *voir dire*, delivered an opening statement, cross-examined the State's witnesses, issued subpoenas, and called several witnesses to testify in his defense. As the trial judge later found, "while [Petitioner's] strategies were certainly questionable he did seem to have a consistent approach in attempting to raise those ongoing themes of corruption and conspiracy and consistently maintained his innocence throughout the proceeding." Tr. 4930. Petitioner's closing argument, while long-winded and not a model of clarity, continued Petitioner's consistent approach. Petitioner demonstrated that he had a rational understanding of the criminal proceedings against him and that he could rationally engage in his defense. He understood the State was required to prove its case beyond a reasonable doubt; he was able to identify the State's evidence indicative of his guilt and was able to formulate arguments to counter or blunt the impact of that evidence. Although Petitioner's argument that local police conspired to frame

him for the murder was unlikely to persuade a jury, the fact that he advanced an unpersuasive argument does not give rise to circumstances requiring another competency hearing.

Thus, this Court concludes the trial court's conclusion that a *sua sponte* competency hearing during Petitioner's trial was not required under *Pate*, together with the Oregon appellate courts's affirmance of that decision, were reasonable in light of the then-existing record. The trial judge reasonably concluded that Petitioner's behavior did not give rise to a *bona fide* doubt that Petitioner had a rational as well as factual understanding of the proceedings against him nor any doubt that Petitioner could rationally engage in his defense. Accordingly, Petitioner has not demonstrated that the trial judge unreasonably found Petitioner competent to proceed or that the judge unreasonably applied *Dusky* or *Pate*, and Petitioner is not entitled to habeas relief on his first claim for relief.

### 2. Second Claim - Waiver of Counsel

In his second claim for relief, Petitioner alleges the trial court erred because Petitioner's waiver of his Sixth Amendment right to the assistance of counsel during the guilt phase of his trial was not knowing, intelligent, or voluntary, and, therefore, Petitioner was deprived of his Due Process rights under the Fourteenth Amendment. In particular, Petitioner argues his

waiver was not voluntary because it was the product of his mental illness.[8]

In *Faretta v. California*, 422 U.S. 806, 821 (1975), the Supreme Court held that a criminal defendant has a Sixth Amendment right to self-representation. A defendant's decision to represent himself and waive the right to counsel must be unequivocal, knowing and intelligent, timely, and not for the purposes of securing delay. *Id.* at 835; *United States v. Arlt*, 41 F.3d 516, 519 (9th Cir. 1994); *Adams v. Carroll*, 875 F.2d 1441, 1444 & n.3 (9th Cir. 1989).

A defendant must also be competent to waive counsel. *Godinez*, 509 U.S. at 396. In *Godinez*, the Court held that the standard of competence for making the decision to waive counsel is the same as the standard of competence to proceed to trial, rejecting the notion that competence to waive counsel must be measured by a standard that is higher than the *Dusky* standard. *Id.* at 398. The Court explained that "the defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel," and "that although the defendant 'may conduct his own defense ultimately to his own

---

[8]In his Amended Petition, Petitioner also alleges his waiver of counsel was not knowing, intelligent, and voluntary because the proceedings by which the trial court accepted his waiver failed to adequately advise Petitioner. In his briefing, however, Petitioner does not argue that the trial court's colloquy was insufficient or that the proceeding in which Petitioner waived his right was otherwise deficient.

detriment, his choice must be honored[.]" *Id.* at 400 (quoting *Faretta*, 422 U.S. at 834-36).

Here, the trial court found Petitioner competent to proceed to trial, a decision this Court found reasonable. Immediately after finding Petitioner competent to stand trial, the trial court addressed Petitioner's motion to waive counsel and strongly advised Petitioner against doing so and that it would be a "huge mistake." Tr. 230. The trial court then engaged in extensive colloquy with Petitioner, over the course of several proceedings, to ensure his waiver was knowing, voluntary, and intelligent. The Court notes that when the trial court subsequently held at the end of the guilt phase that Petitioner would not be allowed to represent himself at the penalty phase, it was not based upon his incompetence. Indeed, while the trial judge explained he had "no reason at this point in time to believe that [Petitioner] is legally incompetent," the judge nevertheless found Petitioner forfeited his right to represent himself because of his failure to follow court orders. Tr. 4688-92. *See United States v. Johnson*, 610 F.3d 1138, 1144 (9th Cir. 2010) (the right to self-representation is not absolute; the constitutional guarantee to a fair trial permits the trial judge to terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct) (citing *Faretta*, 422 U.S. at 834 n.46).

Accordingly, this Court concludes the trial court's finding that Petitioner was competent to stand trial was a reasonable application of federal law as determined by the Supreme Court. Similarly, this Court finds the trial court reasonably applied federal law in allowing Petitioner to waive his right to counsel and to assert his Sixth Amendment right to represent himself.[9] Accordingly, Petitioner is not entitled to habeas relief on his third claim.

### 3. Third Claim - Denial of the Right to a Fair and Impartial Jury[10]

In his third claim for relief, Petitioner alleges he was deprived of his right to a fair and impartial jury as guaranteed by the Sixth Amendment because prior to deliberation during the guilt phase of Petitioner's trial, jurors expressed to the court concerns

---

[9]Petitioner contends the trial court did not apply the correct legal standard in accepting his waiver of counsel, citing the Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164 (2008). *Edwards*, however, had not yet issued at the time of Petitioner's trial in 2006. *See Greene v. Fisher*, 565 U.S. 34, 132 S. Ct. 38, 44 (2011) (holding that the § 2254(d) requires federal courts to "measure state-court decisions against this Court's precedents as of the time the state court renders its decision").

[10]Respondent also argues Petitioner procedurally defaulted his third claim for relief. Because the Court finds Petitioner is not entitled to relief on the merits of this claim, the issue of procedural default need not be addressed. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Runningeagle v. Ryan*, 686 F.3d 758, 778 n.10 (9th Cir. 2012) (exercising discretion afforded under § 2254(b)(2) to decline to address procedural default issue where relief denied on the merits), *cert. denied*, 133 S. Ct. 2766 (2013).

that Petitioner had personal information about them.[11] Petitioner argues that the jurors' fear precluded them from acting impartially, and deciding his guilt based solely on the evidence.

After Petitioner's closing argument when he pulled out the jury questionnaire of one of the alternate jurors and argued that the alternate juror was "openly chummy" with the prosecutor, a member of the jury expressed concern to the trial judge that Petitioner had personal information on the jurors. The court explained to Petitioner:

> We have another issue and I believe it is a direct result of your action, [Petitioner], that a juror, and I'm not providing you the information as to the name of that juror, has indicated a concern about the information that you have of them.

Tr. 4550. The judge then addressed the jury:

> Good morning. In just a moment we're going to have [the prosecutor] give his rebuttal argument. At the end of the day yesterday I received a concern from one of the jurors that as to how much information [Petitioner] has on you personally. This is something that I intend to discuss with you at the appropriate time. I have developed a plan as to dealing with this issue and we can talk about it at the appropriate time in this case.
>
> For the time being, however, you're going to have to trust that the court is taking appropriate actions.

Tr. 4552.

---

[11]In his Amended Petition he also alleged he was denied the right to a fair jury because the trial court failed to excuse for cause one of the jurors who stated an implied and actual bias against Petitioner during *voir dire*. Petitioner does not argue that portion of his claim in briefing to the Court.

After the prosecutor finished his rebuttal argument and the jury had exited the courtroom, Petitioner reiterated his concern that the alternate juror had been "quite chummy with the prosecutor," but argued that he did not intend to intimidate the jury, noting that "I even said that they're free to vote as they wish." Tr. 4590. Petitioner then moved for a mistrial based on juror bias. Tr. 4593. In response, the trial judge first found that the juror's concerns were the result of Petitioner's own conduct, "What we know is we have one juror that expressed a concern based upon your inappropriate use of the juror questionnaire in your closing argument so you have invited this problem." Tr. 4593. The court then denied Petitioner's motion for a mistrial:

> Essentially to the extent that there was any prejudice that was created it was due to your direct, deliberate action. . . . It was in direct violation of this court's instruction that you return that questionnaire to the court and so I am not . . . inclined to grant your motion for mistrial.

Tr. 4597.

At the outset, the Court notes Petitioner presents no evidence that the juror's concerns precluded the jury from acting impartially. Moreover, to the extent that Petitioner may have been prejudiced in the eyes of the jury because he retained a juror questionnaire, any prejudice was due to Petitioner's own direct and deliberate action. As the Ninth Circuit has explained, "the constitutional right to an impartial jury is not absolute. The

Sixth Amendment affords no relief when the defendant's own misconduct caused the alleged juror partiality and the trial judge employed reasonable means under the circumstances to preserve the trial's fairness." *Williams v. Woodford*, 384 F.3d 567, 626 (9th Cir. 2002).

Petitioner argues that he cannot be personally blamed for the juror's fears because he suffered from mental illness. This argument, however, is contrary to the trial court's reasonable fact findings as discussed above. Because there is not any evidence that Petitioner's jury was not impartial, and because any prejudice Petitioner may have suffered was the direct result of his own actions, Petitioner has not demonstrated that the trial court unreasonably applied federal law. Accordingly, Petitioner is not entitled to habeas relief on his third claim.

### 4. Evidentiary Hearing on Claims One through Three

Finally, with respect to Claims One through Three, Petitioner seeks an evidentiary hearing, but the Court denies Petitioner's request. The Court notes that in reviewing the reasonableness of a state court's decision to which § 2254(d) applies, a district court may rely only on the record that was before the state court. *See Pinholster*, 563 U.S. at 181-82. Therefore, a federal court generally is precluded from supplementing the record with facts adduced for the first time at a federal evidentiary hearing when a petitioner's claims have been

adjudicated on the merits in state court. Here, there is not any basis to conclude an evidentiary hearing is warranted.

## II. Actual Innocence - Ground Four

In his fourth claim for relief, Petitioner alleges he is actually innocent because, to the extent there was sufficient evidence to convict him, there was insufficient evidence to establish that he acted with the requisite mental state for legal culpability, and at most Petitioner should have been found guilty except for insanity under Oregon law.[12] As noted, Petitioner did not argue this claim in his initial briefing to the Court; his argument on the issue first appears in the third round of briefing, and even then, Petitioner provides no legal foundation, other than to note that the claim cannot be procedurally barred because claims of actual innocence are not cognizable in Oregon state courts, including post-conviction proceedings.

The Supreme Court has left open the question whether a freestanding claim of actual innocence is cognizable on federal habeas review. *See District Attorney's Office v. Osborne*, 557 U.S. 52, 71 (2009) (whether federal constitutional right to be released upon proof of "actual innocence" exists "is an open question"). The Ninth Circuit has assumed without deciding that freestanding

---

[12]Petitioner also alleges, in the alternative, that there was insufficient evidence to establish he committed the crimes for which he was convicted. Petitioner does not, however, advance any argument on this claim in briefing before the Court.

actual innocence claims are cognizable in both capital and non-capital cases. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). A defendant "asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390, 442-44 (1993) (Blackmun, J., dissenting)). The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive." *Id.* (quoting *Herrera*, 506 U.S. at 417); *see also Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir. 1999) (denying habeas relief where "the totality of the new evidence [did] not undermine the structure of the prosecution's case"). Finally, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Here, Petitioner does not contend that he did not kill Mrs. McGilvra. Instead, he argues that, had the jury been allowed to hear certain evidence, it is reasonably possible that they would not have convicted him of aggravated murder, but would instead have found him guilty except for insanity, resulting in much different treatment than a lifetime of incarceration.

Even if Petitioner could establish that in light of new evidence all reasonable jurors would conclude that he was "guilty except for insanity" under Oregon law, Petitioner has not established that such a showing would demonstrate "actual

innocence." Under Oregon law, "[a] guilty except for insanity finding is not an acquittal-it is a *guilty verdict*. The only difference between a 'guilty' verdict and a 'guilty except for insanity' verdict is the dispositional alternatives, including possible confinement and supervision by the Psychiatric Security Review Board." *State v. Reese*, 156 Or. App. 406, 410, 967 P.3d 514 (1998) (emphasis in original). Thus, even if Petitioner could demonstrate that he was "guilty except for insanity," that showing would not demonstrate that he was factually "innocent" of the charged offense.[13]

Moreover, if a person who was "guilty except for insanity" could be considered "actually innocent," Petitioner has not presented sufficient evidence to support such a theory on this record. To establish the defense of "guilty except for insanity" under Oregon law, a criminal defendant must establish that "as a result of mental disease or defect at the time of engaging in

---

[13]In *Griffin v. Johnson*, 350 F.3d 956 (9th Cir. 2003), the court considered new evidence submitted to support a defense of "guilty except for insanity," and found the evidence submitted was not sufficient. The court did not analyze whether sufficient new evidence upon which all reasonable jurors would conclude a habeas petitioner was "guilty except for insanity" would constitute "actual innocence" under *Herrera* despite the habeas petitioner's guilt as both a factual and legal matter under Oregon law. The Court notes the Seventh Circuit rejected such a claim, finding that new evidence presented to demonstrate that a habeas petitioner suffered from a mental disease or defect at the time of his crime would not effect whether he was guilty of the charged offense; instead, it would impact only his disposition. *Balsewicz v. Kingston*, 425 F.3d 1029, 1033 (7th Cir. 2005).

criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law." Or. Rev. Stat. § 161.295(1). Thus, to establish "actual innocence," Petitioner must demonstrate that, in light of his new evidence, it is likely that *all* reasonable jurors would have concluded that he established the affirmative defense and that *no* reasonable juror would have concluded otherwise.

Here, all of the evidence Petitioner identifies in support of his actual innocence claim was presented to the jury during the penalty phase of Petitioner's trial. While the jurors were not asked to determine whether Petitioner met his burden of proving the defense of "guilty except for insanity," they were asked to determine whether Petitioner had "deliberately" killed Mrs. McGilvra. As to the definition of "deliberately," the trial judge instructed the jurors as follows:

> The word 'deliberately has a different meaning from intentionally. Deliberately means that state of mind that examines and considers whether a contemplated act should or should not be done.
>
> Deliberation is present if the thinking is being done in such a cool mental state under such circumstances and for such a period of time as to permit a careful weighing of the proposed decision.
>
> The law, however, does not prescribe a particular period of time as necessary to constitute deliberation.
>
> Before you may answer this question yes, you must all be convinced of that answer beyond a reasonable doubt. If you decide that the state has failed to prove this

question beyond a reasonable doubt you must answer this
question no.

If all 12 jurors do not agree that the answer is yes,
then you must answer this question no.

Tr. 5572-73.

After receiving this instruction, the jurors unanimously
concluded, beyond a reasonable doubt, that Petitioner had
"deliberately" killed Mrs. McGilvra. The unanimous conclusion
that Petitioner carefully weighed whether to kill Mrs. McGilvra
while in a cool mental state is irreconcilable with Petitioner's
contention that, based on the same evidence, *all* reasonable jurors
would conclude that when Petitioner killed Mrs. McGilvra he lacked
substantial capacity to conform his conduct to the requirements of
the law as required to establish the affirmative defense of "guilty
except for insanity."

Because Petitioner has not met his burden of establishing
"actual innocence" under *Herrera,* he is not entitled to habeas
relief on his fourth claim.

## II. Claims Alleged But Not Argued

As noted above, Petitioner does not provide argument to
support the remaining claims alleged in his Petition.
Accordingly, Petitioner has failed to sustain his burden of
demonstrating why he is entitled to relief on his unargued claims.
*See Lampert v. Blodgett*, 393 F.3d 943, 970 n.16 (9th Cir. 2004)
(petitioner bears burden of proving his case); *Davis v. Woodford,*

384 F.3d 628, 638 (9th Cir. 2003) (same). Nevertheless, the Court has reviewed Petitioner's unargued claims and is satisfied that Petitioner is not entitled to relief on the remaining claims alleged in his Petition for Writ of Habeas Corpus.

## CONCLUSION

For these reasons, the Court DENIES Petitioner's First Amended Petition for Writ of Habeas Corpus (ECF No. 33) and DISMISSES this action. The Court DENIES a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this __1st__ day of May, 2018.

_____
ANNA J. BROWN
United States Senior District Judge